**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **LUKAS RAGAUSKAS,** | |
| **Plaintiff,** | |
| **v.** | **No. 12 C 6333** |
| **CAROLYN W. COLVIN, Acting Commissioner of Social Security,**[1] | **Magistrate Judge Mary M. Rowland** |
| **Defendant.** | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Lukas Ragauskas filed this action seeking review of the final decision of the Commissioner of Social Security (Commissioner) denying his application for Supplemental Security Income under Title XVI of the Social Security Act. 42 U.S.C. §§ 216(i), 223(d), 1614(a)(3)(A). The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and Ragauskas has filed a motion for summary judgment. For the reasons stated below, the case is remanded for further proceedings consistent with this opinion.

## I. SEQUENTIAL EVALUATION PROCESS

To recover Supplemental Security Income (SSI) under Title XVI of the Social Security Act (SSA), a claimant must establish that he or she is disabled within the

---

[1] On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security and is substituted for her predecessor, Michael J. Astrue, as the proper defendant in this action. Fed. R. Civ. P. 26(d)(1).

meaning of the SSA.[2] *York v. Massanari*, 155 F. Supp. 2d 973, 977 (N.D. Ill. 2001). A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 416.909, 416.920; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

---

[2] The regulations governing the determination of disability for SSI are set forth at 20 C.F.R. § 416.901 *et seq.*

## II. PROCEDURAL HISTORY

Ragauskas applied for SSI on February 15, 2011, alleging that he became disabled on March 1, 2000, due to cystic fibrosis, attention deficit hyperactivity disorder (ADHD), and Wolff-Parkinson-White syndrome.[3] (R. at 20, 63, 64, 89, 161). The application was denied initially and on reconsideration, after which Ragauskas filed a timely request for a hearing. (*Id*. at 20, 63–79, 86–101). On April 26, 2012, Ragauskas, represented by counsel, testified at a hearing before an Administrative Law Judge (ALJ). (*Id*. at 20, 31–52o). The ALJ also heard testimony from Violeta Laukinatis, Ragauskas's mother.[4] (*Id*. at 23, 31–32, 49–52, 211).

The ALJ denied Ragauskas's request for benefits on May 7, 2012. (R. at 20–26). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Ragauskas had not engaged in substantial gainful activity since February 15, 2011, the application date. (*Id*. at 23). At step two, the ALJ found that Ragauskas's cystic fibrosis with a history of pancreatic insufficiency, mild thyroidmegaly, and ADHD are severe impairments. (*Id*.). At step three, the ALJ determined that Ragauskas does not have an impairment or combination of impairments that meet or medically equal the severity of any of the listings enumerated in the regulations. (*Id*. at 23–24).

---

[3] "Wolff-Parkinson-White syndrome is a heart condition in which there is an abnormal extra electrical pathway of the heart. The condition can lead to episodes of rapid heart rate." <http://www.nlm.nih.gov/medlineplus/ency/article/000151.htm>

[4] The hearing transcript incorrectly refers to Ragauskas's mother as Ms. Ragauskas. (*Compare* R. at 23, 211 *with id*. at 31, 32, 49).

The ALJ then assessed Ragauskas's residual functional capacity (RFC)[5] and determined that he has the RFC to perform light work, as defined in 20 C.F.R. § 416.967(b), "not involving concentrated exposure to respiratory irritants, temperature extremes, or humidity." (R. at 24). At step four, the ALJ determined that Ragauskas has no past relevant work. (*Id.* at 25). At step five, based on Ragauskas's RFC, age, education, and work experience, the ALJ used the Medical-Vocational Guidelines (Grid) to determine that there are jobs that exist in significant numbers in the national economy that Ragauskas can perform.[6] (*Id.* at 25–26). Accordingly, the ALJ concluded that Ragauskas was not suffering from a disability as defined by the SSA. (*Id.* at 26).

The Appeals Council denied Ragauskas's request for review on July 26, 2012. (R. at 1–5). Ragauskas now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

### III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the SSA. In reviewing this decision, the Court may not engage in its own analysis of

---

[5] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. § 404.1520(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675–76 (7th Cir. 2008).

[6] The Grid reflects the Commissioner's determination that "certain combinations of age, education, work experience, and exertional limitations direct a finding of either disabled or not disabled at step five of the disability analysis." *Abbott v. Astrue*, 391 F. App'x 554, 556 (7th Cir. 2010); *see Haynes v. Barnhart*, 416 F.3d 621, 627–28 (7th Cir. 2005); 20 C.F.R. pt. 404, subpt. P, app. 2.

whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). The Court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young,* 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## IV. MEDICAL EVIDENCE

Ragauskas was first diagnosed with cystic fibrosis[7] in 2000, at the age of eight. (R. at 394–95). In July 2008, his health was maintained with pancreatic enzymes, TOBI,[8] azithromycin, and fat soluble vitamins. (*Id.* at 395). Ragauskas complained of morning nausea, but no vomiting. (*Id.*). In August 2008, he reported intermittent episodes of shortness of breath. (*Id.* at 298).

On March 29, 2010, Ragauskas began treating with Sean M. Forsythe, M.D. (R. at 392). Ragauskas's respiratory symptoms included dyspnea,[9] cough, and sputum. (*Id.*). He kept his airway clear with Acapella therapy in the morning, the Vest for 20 minutes in the afternoon, and mucolytics—hypertonic saline and Pulmozyme.[10] (*Id.*). His other medications included Azithromycin, Cephalexin, Levalbuterol nebulizer solution, Levoceterizine, Dihydrochloride, Omeprazole, Pancrecarb,

---

[7] Cystic fibrosis is an "inherited disease of the exocrine glands, primarily affecting the GI and respiratory systems, and usually characterized by COPD, exocrine pancreatic insufficiency, and abnormally high sweat electrolytes." *The Merck Manual of Diagnosis and Therapy* 2366 (17th ed. 1999).

[8] Tobramycin inhalation solution (TOBI) is used to treat persons with cystic fibrosis who have a persistent lung infection. "People with cystic fibrosis produce thick, sticky mucus that can plug up the tubes, ducts and passageways in the lungs. This can result in serious breathing problems and infections in the lungs." In order to lessen the likelihood that the bacteria will develop a resistance to TOBI, the medicine is typically used for 28 days, followed by 28 days without the medication.
<www.medicinenet.com/tobramycin_inhalation_solution-oral>

[9] Dyspnea is "[s]hortness of breath, a subjective difficulty of distress in breathing, usually associated with serious disease of the heart or lungs." *Stedman's Medical Dictionary* 435 (5th ed. 1982).

[10] The Acapella is an oscillating positive expiratory pressure device. "Breathing with [the Acapella] vibrates the large and small airways. This vibration thins, dislodges and moves mucus." The Vest is an inflatable vest that "is attached to a machine that vibrates it at high frequency. The vest vibrates the chest to loosen and thin mucus." Mucolytics are medications used to thin mucus so it can be coughed out easier. <www.cff.org>

Pancrelipase, sodium chloride hypertonic solution for nebulizer, Source Abdek, TOBI (15 days on, 15 days off), vitamins, and Voriconazole. (*Id.* at 392–93). Ragauskas reported that his exercise tolerance was slowly improving; he was able to walk with 10-pound weights every morning. (*Id.* at 392). Dr. Forsythe found that Ragauskas had very good lung function, encouraged him to increase his exercises, and discontinued Voriconazole. (*Id.* at 394).

On May 19, 2010, Ragauskas reported feeling well, although his nausea had returned. (R. at 389). His exercise tolerance was good. (*Id.*). On examination, Dr. Forsythe found that Ragauskas's spirometry and symptoms were stable and good. (*Id.* at 391).

On June 30, 2010, Ragauskas reported more GI problems—nausea, fatigue, shaky, feeling hot, sour feeling in his throat, and heartburn. (R. at 387–88). Although he just completed his most recent TOBI therapy, Ragauskas was coughing more. (*Id.* at 388). On examination, Dr. Forsythe found Ragauskas's pulmonary function "very slightly worse." (*Id.* at 389). Dr. Forsythe referred Ragauskas to his GI doctor to check for pancreatitis or gallbladder disease. (*Id.*).

On September 17, 2010, Ragauskas reported nausea most days; he wakes up with it and it persists all day long, sometimes accompanied by a gagging feeling in the back of his throat. (R. at 386). His respiratory symptoms were at baseline, but his exercise tolerance was poor—he had no energy. (*Id.*). Dr. Forsythe reviewed the GI doctor's report, which indicated that Ragauskas's nausea did not appear to have a GI cause. (*Id.* at 387). Dr. Forsythe concluded that the nausea may be sinus

disease, endocrine problems—Ragauskas has a history of adrenal insufficiency—or pulmonary disease. (*Id*.) He referred Ragauskas to an endocrinologist to determine if the nausea is caused by a sinus disease. (*Id*.).

On November 5, 2010, Ragauskas reported no improvements. (R. at 384). He had frequent nausea, no energy, worsening cough, and fair exercise tolerance. (*Id*.). He reported no improvements from escalating therapy for sinus disease. (*Id*. at 386). He continues to lose weight. (*Id*. at 384). On examination, Dr. Forsythe found normal lung function, with slightly increased symptoms. (*Id*. at 386). He advised Ragauskas to start his TOBI therapy early and referred him to another endocrinologist. (*Id*.). To determine if the nausea was a side-effect to Ragauskas's medications, Dr. Forsythe discontinued azithromycin and supplements to see if it improves. (*Id*.).

On January 12, 2011, Ragauskas reported that his symptoms improved slightly with his trial off medications. (R. at 379). He still had nausea four to five days a week, but it stopped by night time. (*Id*.). His respiratory symptoms included some cough and sputum and were at baseline. (*Id*.). Ragauskas's exercise tolerance was fair. (*Id*.). On examination, Dr. Forsythe found that Ragauskas's pulmonary spirometry and symptoms were normal. (*Id*. at 380). He diagnosed chronic nausea, and pancreatic enzyme insufficiency. (*Id*.).

On January 25, 2011, Timothy A.S. Sentongo, M.D. performed a diagnostic upper endoscopy and colonoscopy on Ragauskas. (R. at 345). He found mild nodularity in the mid and distal esophagus with white plaques suggestive of

Candida. (*Id.*). Dr. Sentongo diagnosed esophageal candida infection and prescribed Fluconazole. (*Id.*).

On March 23, 2011, Herman P. Langner, M.D. performed a psychiatric evaluation on behalf of the Commissioner. (R. at 423–25). Ragauskas reported his history of cystic fibrosis and Wolff-Parkinson's disorder, and his past history of ADHD. (*Id.* at 423). After examining Ragauskas, Dr. Langner diagnosed ADHD, cystic fibrosis, and Wolf Parkinson's disease, by history, and estimated Ragauskas's Global Assessment of Functioning (GAF) at 45–50.[11] (*Id.* at 425).

On April 6, 2011, Ragauskas reported doing well, although he was frequently fatigued and had trouble keeping up; he must nap both after school and after work. (R. at 431). His exercise tolerance was fair; two days a week, he was able to walk with weights. (*Id.*). On examination, Ragauskas's spirometry was stable and normal, but his symptoms were slightly increased with more coughing. (*Id.* at 432). Dr. Forsythe recommended continued airway clearance regimens, including mucolytics and TOBI. (*Id.*).

In a separate report prepared for the Illinois Department of Human Services, Dr. Forsythe stated that Ragauskas's chief complains were persistent cough and fatigue. (R. at 443). Dr. Forsythe diagnosed cystic fibrosis, pancreatic insufficiency,

---

[11] The GAF includes a scale ranging from 0–100, and indicates a "clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Rev. 2000) [hereinafter DSM IV]. A GAF score of 41–50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.* at 34.

and adrenal insufficiency. (*Id.*). In regards to Ragauskas's malabsorption issue, Dr. Forsythe reported good response to pancreatic enzyme replacement therapy. (*Id.* at 444). However, Ragauskas had only a fair response to steroid replacement therapy for his orthostatic hypotension[12] and adrenal insufficiency. (*Id.* at 445).

On May 16, 2011, Young-Ja Kim, M.D., a DDS nonexamining physician, completed a physical RFC assessment. (R. at 59–60). Dr. Kim concluded that Ragauskas was capable of light work, but should avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, fumes, odors, dusts, gases, and poor ventilation. (*Id.*). On August 20, 2011, Calixto Aquino, another DDS nonexamining physician, affirmed Dr. Kim's assessment. (*Id.* at 71–73).

On March 21, 2012, Dr. Forsythe completed a physical RFC assessment. (R. at 447–54). He concluded that because of Ragauskas's cystic fibrosis with lung disease and endocrine disease, Ragauskas was capable of occasionally lifting 10 pounds, frequently less than 10 pounds, and standing, walking, and sitting less than two hours in an eight-hour workday. (*Id.* at 448). Ragauskas should also avoid concentrated exposure to extreme cold, extreme heat, and humidity. (*Id.* at 451). Dr. Forsythe stated that these limitations were caused by Ragauskas's dyspnea on exertion and his extreme fatigue. (*Id.* at 452).

---

[12] "Orthostatic hypotension, also known as postural hypotension, orthostasis, and colloquially as head rush or dizzy spell, is a form of hypotension in which a person's blood pressure suddenly falls when standing up or stretching." <en.wikipedia.org/wiki/Orthostatic_hypotension>

On April 20, 2012, after seeing Ragauskas every one to three months since March 2010, Dr. Forsythe summarized his medical findings:

> [Ragauskas] has cystic fibrosis, a chronic progressive genetic disorder, that results in chronic lung disease with episodic infectious exacerbations, pancreatic insufficiency, nutritional problems and endocrine problems.

> [Ragauskas] is on chronic pulmonary therapies, including airway clearance, nebulized antibiotics, mucolytics. Each of these treatments takes ~20 minutes, and the [*sic*] need to be taken at least twice daily. Recently, [Ragauskas] has had pulmonary exacerbations every 2–3 months, requiring an escalation of his therapy and antibiotics (either oral or IV). On top of this, he is on pancreatic enzyme replacement that needs to be taken every time he eats.

> [Ragauskas] has also had problems maintaining his weight, and with fatigue, both related to the chronic infections and the multi-organ manifestations of his cystic fibrosis.

> In my medical opinion, [Ragauskas] is not capable of standing or walking for more than 30 minutes due to his breathing problems and fatigue. I also do not believe that he can stand or walk for more than 2 hours over an 8 hour period.

> Unfortunately, as this is a chronic progressive disease, I don't think [Ragauskas's] symptoms will improve, and will most likely slowly deteriorate over time.

(R. at 456).

At the hearing, Ragauskas testified that he works 12 hours a week as a maintenance assistant for the Village of Hinsdale, changing light bulbs, cleaning windows, dusting, and other small jobs. (R. at 35). He works 2½ hours four days a week and 2 hours one day a week. (*Id.* at 36). He is unable to work any more hours because of fatigue—he gets tired very quickly—and ADHD. (*Id.* at 35–36). On occasion, he has fallen asleep at work. (*Id.* at 42). He gets tired from standing and walking; every 20–30 minutes, he needs to take a 10-minute break. (*Id.* at 45). Ragauskas's employer has made special accommodations for his illness, allowing

him to take frequent breaks and attend all his doctor's appointments. (*Id.* at 46–47). Ragauskas is also attending college, taking two courses at the College of DuPage. (*Id.* at 35).

Ragauskas occasionally drives a car, but only for short trips because he gets easily fatigued. (R. at 37). Ragauskas explained that his cystic fibrosis feels like he's breathing through a straw while trying to run up a flight of stairs. (*Id.* at 38). Consequently, he suffers from constant fatigue. (*Id.*). His morning treatments involve multiple medications and can take up to two hours, depending on whether he is on or off the TOBI treatment. (*Id.* at 40). Ragauskas takes frequent naps during the day. (*Id.* at 39). He naps for 1½ hours between work and school, and then takes another nap after his evening Vest treatments. (*Id.*).

## V. DISCUSSION

Ragauskas raises four arguments in support of his request to reverse or remand: (1) the ALJ erred by failing to find that Ragauskas's impairments meet or equal Listing 3.04(C); (2) the ALJ failed to analyze all the evidence; (3) the ALJ improperly rejected Dr. Forsythe's opinion; and (4) the ALJ's credibility finding was "patently wrong." (Mot. 1, 8). The Court addresses each argument in turn.

## A. Listing 3.04(C)

At step three, the ALJ determined that Ragauskas does not have an impairment or combination of impairments that meets or medically equals the severity of any of the listings enumerated in the regulations. (R. at 23–24). Specifically, that ALJ concluded:

> Counsel argued that [Ragauskas's] condition meets listing 3.04(C). Section 3.04(C) requires persistent pulmonary infection accompanied by superimposed, recurrent, symptomatic episodes of increased bacterial infection occurring at least once every six months and requiring intravenous or nebulization antimicrobial therapy. However, the record does not make such a showing.

(*Id.*) (citation omitted); *see* 20 C.F.R. pt. 404, subpt. P, app. 1 § 3.04(C). Ragauskas challenges the validity of the ALJ's determination, arguing that Ragauskas's "preventative care exceeds the listing's requirements, and he still suffers from exacerbations. The ALJ failed to address any of this evidence." (Mot. 9) (emphasis omitted).

At step three, a claimant is presumptively disabled if he or she has an impairment that meets or equals one of a list of specific impairments enumerated in the Listings of Impairments. *Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999); *see* 20 C.F.R. §§ 404.1520(d), 416.920(d), pt. 404, subpt. P, app. 1. "The Listing describes impairments that are considered presumptively disabling when a claimant's impairments meet the specific criteria described in the Listing." *Maggard*, 167 F.3d at 379–80; *see* 20 C.F.R. §§ 404.1525(a), 416.925(a).

"A claimant may also demonstrate presumptive disability by showing that her impairment is accompanied by symptoms that are equal in severity to those described in a specific listing." *Barnett v. Barnhart*, 381 F.3d 664, 664 (7th Cir. 2004); *see* 20 C.F.R. §§ 404.1526(a), 416.926(a). "Thus, an impairment is equivalent to a listed impairment 'if it is at least equal in severity and duration to the criteria of any listed impairment.'" Frank S. Bloch, *Bloch on Social Security* § 3.26 (May 2011) (quoting 20 C.F.R. §§ 404.1526(a), 416.926(a)). Medical equivalence may be

found in one of three ways: (1) the claimant's impairment is included in the listings but one or more of the criteria set out in the listing for that impairment cannot be met; (2) the claimant's impairment is not included in the listings, but another listed impairment can be used as a guide; or (3) the claimant has a number of impairments that do not meet or equal a listed impairment, but can be combined together to meet an analogous impairment in the listings. *See* 20 C.F.R. §§ 404.1526(b); 416.926(e); *Bloch on Social Security* § 3.26. In determining whether a claimant's impairment is medically equivalent to a listed impairment, the SSA will consider all relevant evidence. 20 C.F.R. §§ 404.1526(c), 416.926(c) ("When we determine if your impairment medically equals a listing, we consider all evidence in your case record about your impairment(s) and its effects on you that is relevant to this finding."). The ALJ's analysis of this issue must be supported by substantial evidence and therefore, at the very least, the ALJ's opinion must include a robust discussion that demonstrates how the ALJ arrived at her conclusion and permits a meaningful evaluation of the ALJ's analysis by a reviewing court. *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009) (ALJ's listing analysis must be supported by substantial evidence); *Steele*, 290 F.3d at 940 (same).

Here, the ALJ's opinion contained no such "robust discussion." Instead, after reiterating the Listing 3.04(C) requirements, the ALJ merely concluded—in a single sentence, without any discussion—that the record does not support the listing. (R. at 24). But the record does include evidence that contradicts the ALJ's conclusion. Dr. Forsythe, Ragauskas's treating pulmonologist, explained that his cystic fibrosis

is a chronic, progressive lung disease that manifests as "episodic infectious exacerbations, pancreatic insufficiency, nutritional problems and endocrine problems." (*Id.* at 456). In order to prevent severe exacerbations, Ragauskas maintains an extensive treatment regimen of perpetually rotating nebulized antibiotic treatments, including TOBI. (*Id.* at 395, 456; *see id.* at 39–40). Despite these treatments, Ragauskas "has had pulmonary exacerbations every 2–3 months, requiring an escalation of this therapy and antibiotics." (*Id.* at 456). The ALJ's one-sentence analysis is insufficient in light of the listing's detailed medical requirement and the evidence in the record, including Ragauskas's testimony, that suggests his impairments may meet Listing 3.04(C). At a minimum, the ALJ should have explicitly addressed Dr. Forsythe's findings before concluding that Ragauskas does not meet or equal the listing.

Defendant contends that the ALJ was correct to reject Dr. Forsythe's opinion because his opinion does not indicate the frequency of Ragauskas's episodic exacerbations and "did not indicate that these exacerbations are pulmonary infections accompanied by superimposed, recurrent, symptomatic episodes of increased bacterial infection." (Resp. 4). The Court, however, must limit its review to the rationale offered by the ALJ. *See SEC v. Chenery Corp.*, 318 U.S. 80, 90–93 (1943); *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010) ("the government's brief and oral argument . . . seem determined to dissolve the *Chenery* doctrine in an acid of harmless error"). And here, the ALJ did not discuss Dr. Forsythe's opinion before finding that Ragauskas's impairments do not meet or equal Listing 3.04(C). In any

event, even if Dr. Forsythe's opinion does not match the listing requirements word for word, the ALJ should have explicitly determined whether medical equivalence applies.

On remand, the ALJ shall reconsider whether Ragauskas's impairments meet or equal Listing 3.04(C), thoroughly discussing the medical evidence, including Dr. Forsythe's opinion. *See Moss*, 555 F.3d at 562. If the ALJ has any questions about whether Ragauskas's impairments meet the listing, he should summon a medical expert to testify at a hearing on the matter. *See Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000) (An ALJ must "summon a medical expert if that is necessary to provide an informed basis for determining whether the claimant is disabled."); *see also* 20 C.F.R. §§ 404.1527(e)(2)(iii), 416.927(e)(2)(iii).

## B. Treating Physician

Ragauskas contends that the ALJ improperly rejected Dr. Forsythe's opinion. (Mot. 11–13). He asserts that the ALJ failed to identify what "substantial evidence" contradicted Dr. Forsythe's opinion or how the "substantial evidence" fails to support the treating physician's opinion. (*Id.* 12). Ragauskas argues that the ALJ did not provide good reasons for rejecting Dr. Forsythe's opinion and failed to discuss the factors that must be considered when a treating source's opinion is not given controlling weight. (*Id.* 13).

By rule, "in determining whether a claimant is entitled to Social Security disability benefits, special weight is accorded opinions of the claimant's treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). The

opinion of a treating source is entitled to controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2); *accord Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). A treating physician typically has a better opportunity to judge a claimant's limitations than a nontreating physician. *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996); *Grindle v. Sullivan*, 774 F. Supp. 1501, 1507–08 (N.D. Ill. 1991). "More weight is given to the opinion of treating physicians because of their greater familiarity with the claimant's conditions and circumstances." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Therefore, an ALJ "must offer 'good reasons' for discounting a treating physician's opinion," and "can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(2); other citation omitted).

Ragauskas has treated with Dr. Forsythe for over two years, beginning in 2010 and continuing every one to three months through at least April 2012. (R. at 392, 456). In March 2012, Dr. Forsythe opined that because of cystic fibrosis, endocrine disease, dyspnea on exertion, and extreme fatigue, Ragauskas cannot sustain a full workday and should avoid concentrated exposure to extreme cold, extreme heat, and humidity. (*Id.* at 447–54). Similarly, in April 2012, Dr. Forsythe opined that because of his breathing problems and fatigue, Ragauskas is not capable of standing

or walking for more than 30 minutes at one time or more than 2 hours in an 8-hour workday. (*Id.* at 456).

In his decision, the ALJ acknowledged that Dr. Forsythe had seen Ragauskas every two or three months since March 2010 for cystic fibrosis, pancreatic insufficiency, and adrenal insufficiency. (R. at 24). Nevertheless, he gave Dr. Forsythe's assessments "limited weight" because

> they are not well supported and inconsistent with the other substantial evidence, including a report that in addition to attending college and working part time, [Ragauskas] also works out twice a week, as reported by Dr. Forsythe.

> At a consultative examination in March 2011 by Dr. Langner, [Ragauskas] indicated that he performed activities of daily living independently, attended the College of DuPage and did part time maintenance work.

(*Id.* at 24–25) (citations omitted).

Under the circumstances, the ALJ's decision to give Dr. Forsythe's opinion "limited weight" is legally insufficient and not supported by substantial evidence. First, the ALJ does not explain how Ragauskas's activities of daily living—taking two college courses, working part time, and exercising occasionally—contradict Dr. Forsythe's opinion. Ragauskas is able to work only 2½ hours each day because of extreme fatigue. (R. at 35–36). On occasion, he has fallen asleep at work. (*Id.* at 42). He gets tired from standing and walking; every 20–30 minutes, he needs to take a 10-minute break. (*Id.* at 45). Ragauskas's employer has made special accommodations for his illness, allowing him to take frequent breaks and attend all his doctor's appointments. (*Id.* at 46–47). While Ragauskas is attending college, he

is taking only two courses, for only four hours a week. (*Id.* at 35, 43, 384). Moreover, because of his fatigue, Ragauskas takes frequent naps during the day. (*Id.* at 39). On those days when he has both school and work, he must take a 1½-hour nap both before and after work. (*Id.* at 39, 43). Finally, as the medical record clearly demonstrates, Ragauskas's "workouts" consist of him walking with 10-pound weights. (*Id.* at 392, 431). His exercise tolerance was consistently evaluated as only "poor" or "fair," and by April 2011, he was able to walk with weights only twice a week. (*Id.* at 379, 384, 386, 431). In sum, Ragauskas's daily activities are consistent with Dr. Forsythe's opinion that Ragauskas cannot stand or walk for more than 30 minutes at one time or more than 2 hours in an 8-hour workday.

Second, Ragauskas's activities of daily living do not translate into an ability to perform fulltime work. Indeed, the Seventh Circuit has "repeatedly cautioned that a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time." *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013); *see Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) ("The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases."). And here, the ALJ does not explain how Ragauskas's ability to work and attend school for 16 hours a week and to walk with weights two days a week equates to the ability to work fulltime.

Third, the medical evidence supports Dr. Forsythe's opinion. Ragauskas's dyspnea on exertion and extreme fatigue are well documented in the medical

record. (*See*, *e.g.*, R. at 298 (intermittent episodes of shortness of breath), 384 (no energy, worsening cough), 386 (no energy), 387–88 (fatigue, coughing, worsening pulmonary function), 392 (dyspnea, cough, and sputum), 431 (frequently fatigued, worsening pulmonary symptoms), 443 (persistent cough and fatigue), 445 (orthostatic hypotension)). Moreover, Dr. Langner assigned Ragauskas a GAF score of 45–50, which indicates a serious impairment in occupational functioning. (*Id.* at 425); *see* DSM IV at 34. The ALJ cannot discuss only those portions of the record that support his opinion. *See Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009) ("An ALJ may not selectively consider medical reports, especially those of treating physicians, but must consider all relevant evidence. It is not enough for the ALJ to address mere portions of a doctor's report.") (citations omitted); *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("An ALJ cannot disregard medical evidence simply because it is at odds with the ALJ's own unqualified opinion.").

Finally, the ALJ did not explain which parts of Dr. Forsythe's opinion he was adopting and which parts he was rejecting. While the ALJ is not required to address every piece of evidence, he must provide a "logical bridge" between the evidence and his conclusion. *See Terry v. Astrue,* 580 F.3d 471, 475 (7th Cir.2009). "An ALJ must not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record." *Clifford,* 227 F.3d at 870; *see Rohan v. Chater,* 98 F.3d 966, 968 (7th Cir.1996) ("As this Court has counseled on many occasions, ALJs must not succumb to the temptation to play doctor and make their own independent medical findings."). Instead, the ALJ must provide specific,

legitimate reasons for rejecting the treating physician's findings. *Clifford,* 227 F.3d at 870; *accord Rojas v. Astrue,* 2010 WL 4876698, at *8 (N.D. Ill. Nov.19, 2010); *see* 20 C.F.R. § 404.1527(d)(2) ("We will always give good reasons . . . for the weight we give your treating source's opinion."); Social Security Ruling (SSR)[13] 96–2p, at *5 ("decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight"). In effect, the ALJ erred when he substituted his judgment for that of Dr. Forsythe's and left unexplained why he was ignoring some but not all of Dr. Forsythe's observations and findings. *See Clifford,* 227 F.3d at 870.

Generally, the Commissioner gives more weight to treating sources, "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(d)(2). If an ALJ does not give a treating physician's opinion controlling weight, the

---

[13] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel,* 210 F.3d 799, 803 (7th Cir. 2000); *see* 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably *bound* by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

regulations require the ALJ to consider a checklist of factors—"the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion"—to determine what weight to give the opinion. *Moss*, 555 F.3d at 561; 20 C.F.R. § 404.1527.

Here, the ALJ did not explicitly address the checklist of factors as applied to the medical opinion evidence. *See Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) (criticizing the ALJ's decision which "said nothing regarding this required checklist of factors"); *Bauer*, 532 F.3d at 608 (stating that when the treating physician's opinion is not given controlling weight "the checklist comes into play"). And many of the factors support the conclusion that Dr. Forsythe's opinion should be given great weight: he is a pulmonologist who treated Ragauskas on a regular basis for over two years, his findings were supported by diagnostic observations, and his findings were consistent with the medical evidence. "Proper consideration of these factors may have caused the ALJ to accord greater weight to [Dr. Forsythe's] opinion." *Campbell*, 627 F.3d at 308.

On remand, the ALJ shall reevaluate the weight to be afforded Dr. Forsythe's opinion. If the ALJ has any questions about whether to give controlling weight to Dr. Forsythe's opinion, he is encouraged to recontact him, order a consultative examination, or seek the assistance of a medical expert. *See* SSR 96-5p, at *2; 20 C.F.R. §§ 404.1517, 416.917, 404.1527(e)(2)(iii), 416.927(e)(2)(iii); *see also Barnett*, 381 F.3d at 669 ("If the ALJ thought he needed to know the basis of medical

opinions in order to evaluate them, he had a duty to conduct an appropriate inquiry, for example, by subpoenaing the physicians or submitting further questions to them.") (citation omitted). If the ALJ finds "good reasons" for not giving Dr. Forsythe's opinion controlling weight, *see Campbell*, 627 F.3d at 306, the ALJ shall explicitly "consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion," *Moss*, 555 F.3d at 561, in determining what weight to give Dr. Forsythe's opinion.

## C. Credibility

Ragauskas contends that the ALJ erred in discounting his testimony about the nature and extent of his ailments. (Mot. 13–14). He asserts that the ALJ's credibility determination was conclusory boilerplate, failed to analyze the requisite factors, and cited no evidence to support his characterization of Ragauskas's use of medication, his treatment, or his activities. (*Id.* 14). Ragauskas also argues that the ALJ failed to consider his testimony, and that of his mother's, in its entirety. (*Id.* 9–11).

An ALJ's credibility determination may be overturned only if it is "patently wrong." *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). In determining credibility, "an ALJ must consider several factors, including the claimant's daily activities, [his] level of pain or symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons." *Villano*, 556 F.3d at 562 (citations omitted); *see* 20 C.F.R. § 404.1529(c); Social Security

Ruling ("SSR") 96-7p. An ALJ may not discredit a claimant's testimony about his symptoms "solely because there is no objective medical evidence supporting it." *Villano*, 556 F.3d at 562 (citing SSR 96-7p; 20 C.F.R. § 404.1529(c)(2)); *see Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) ("The administrative law judge cannot disbelieve [the claimant's] testimony solely because it seems in excess of the 'objective' medical testimony."). Even if a claimant's symptoms are not supported *directly* by the medical evidence, the ALJ may not ignore *circumstantial* evidence, medical or lay, which does support claimant's credibility. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539–40 (7th Cir. 2003). Indeed, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citation omitted); *see* 20 C.F.R. § 404.1529(c); SSR 96-7p.

The Court will uphold an ALJ's credibility finding if the ALJ gives specific reasons for that finding, supported by substantial evidence. *Moss*, 555 F.3d at 561. The ALJ's decision "must contain specific reasons for a credibility finding; the ALJ may not simply recite the factors that are described in the regulations." *Steele*, 290 F.3d at 942 (citation omitted); *see* SSR 96-7p. "Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed." *Steele*, 290 F.3d at 942.

In his decision, the ALJ made the following credibility determination:

> [Ragauskas's] testimony of symptoms and functional limitations, when compared against the objective evidence and evaluated using the factors in SSR 96-7p, was not credible in establishing disabling limitations in view of, especially, his inconsistent use of medication, his disproportionate pursuit of treatment, and his activities that include simultaneous part time work and education.
>
> \*　　\*　　\*
>
> After careful consideration of the evidence, the undersigned finds that [Ragauskas's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Ragauskas's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above residual functional capacity assessment.

(R. at 24, 25).

Much of the ALJ's analysis is mere boilerplate that "yields no clue to what weight the trier of fact gave [Ragauskas's] testimony." *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) (reviewing similar language and finding that "[i]t is not only boilerplate; it is meaningless boilerplate[; t]he statement by a trier of fact that a witness's testimony is 'not *entirely* credible' yields no clue to what weight the trier of fact gave the testimony"); *see Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003) ("This is precisely the kind of conclusory determination SSR 96-7p prohibits."). The ALJ does not explain which of Ragauskas's allegations were credible, which were incredible, or provide reasoning in support of his findings. *See Groneman v. Barnhart*, No. 06 C 0523, 2007 WL 781750, at \*11 (N.D. Ill. March 9, 2007) ("The ALJ may have provided a *reason* for rejecting [claimant's] allegations— because he did not seek treatment and follow through with medication—but he did not provide *reasoning*.") (emphasis in original). The ALJ's decision "must contain

specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96–7p, at *2.

Under the circumstances, none of the reasons provided by the ALJ for rejecting Ragauskas's credibility are legally sufficient or supported by substantial evidence. First, as a preliminary matter, the ALJ failed to assess Ragauskas's credibility *before* determining his RFC. That Ragauskas's statements were "not credible to the extent that they are inconsistent with the above residual functional capacity assessment" (R. at 25), is "backward reasoning," *Dogan v. Astrue*, 751 F. Supp. 2d 1029, 1042 (N.D. Ind. 2010). The ALJ's "post-hoc statement turns the credibility determination process on its head by finding statements that support the ruling credible and rejecting those statements that do not, rather than evaluating the [claimant's] credibility as an initial matter in order to come to a decision on the merits." *Brindisi*, 315 F.3d at 788.

Second, as discussed above, Ragauskas's "simultaneous part time work and education" does not undermine his complaints of extreme fatigue and dyspnea. Ragauskas is able to work only 2½ hours each day because of extreme fatigue. (R. at 35–36). He gets tired from standing and walking; every 20–30 minutes, he needs to take a 10-minute break. (*Id.* at 45). Ragauskas's employer has made special accommodations for his illness, allowing him to take frequent breaks and attend all his doctor's appointments. (*Id.* at 46–47). Moreover, on those days when he has both

school and work, he must take a 1½-hour nap both before and after work. (*Id.* at 39, 43). "[A]lthough it is appropriate for an ALJ to consider a claimant's daily activities when evaluating [his] credibility, SSR 96–7p, at *3, this must be done with care." *Roddy*, 705 F.3d at 639. "The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . , and is not held to a minimum standard of performance, as she would be by an employer." *Bjornson*, 671 F.3d at 647. And here, the ALJ does not explain how Ragauskas's ability to work and attend school for 16 hours a week equates to the ability to work fulltime.

Third, the ALJ provides no record support for his conclusion that Ragauskas's credibility is undermined by "his inconsistent use of medication [and] his disproportionate pursuit of treatment." (R. at 24). Indeed, the Commissioner makes no attempt to identify what the ALJ may be referring to. (*See* Resp. 7–10). To the extent that the ALJ is referring to an isolated gap with Ragauskas taking his medications, the ALJ failed to properly develop the record. At the hearing, Ragauskas testified that he consistently takes eleven different medications, but that he recently stopped taking his nebulizer treatments for a brief period of time because he "couldn't bring all [his] medications with" him on a trip to Florida. (R. at 36–37, 289; *see also id.* at 22). The ALJ accepted Ragauskas's explanation without any further questions. (*Id.* at 37). The ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the

individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." SSR 96-7p, at *7; *accord Roddy*, 705 F.3d at 638. Similarly, if the ALJ believed there was some evidence of "disproportionate pursuit of treatment," the ALJ should have questioned Ragauskas at the administrative hearing on this issue before discounting his credibility. *Roddy*, 705 F.3d at 638–39 ("The agency requires ALJs to inquire about a claimant's reasons for not seeking treatment."); SSR 96-7p, at *7 (The ALJ "may need to . . . question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner. The explanations provided by the individual may provide insight into the individual's credibility.").

The Court finds the ALJ's credibility determination "patently wrong." *Craft*, 539 at 678. On remand, the ALJ shall reevaluate Ragauskas's complaints with due regard for the full range of medical evidence. *See Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001).

## D. Summary

In sum, the ALJ has failed to "build an accurate and logical bridge from the evidence to [his] conclusion." *Steele*, 290 F.3d at 941 (internal quotation omitted). This prevents the court from assessing the validity of the ALJ's findings and providing meaningful judicial review. *See Scott*, 297 F.3d at 595. For the reasons set forth herein, the ALJ's decision is not supported by substantial evidence. On

remand, the ALJ shall reevaluate the weight to be afforded Dr. Forsythe's opinion, explicitly addressing the required checklist of factors. The ALJ shall reassess Ragauskas's credibility with due regard for the full range of medical evidence. The ALJ shall reconsider whether Ragauskas's impairments meet or equal Listing 3.04(C), thoroughly discussing the medical evidence, including Dr. Forsythe's opinion. The ALJ shall then reevaluate Ragauskas's physical and mental impairments and RFC, considering all of the evidence of record, including Ragauskas's testimony, and shall explain the basis of his findings in accordance with applicable regulations and rulings.

## V. CONCLUSION

For the reasons stated above, Ragauskas's Motion for Summary Judgment [16] is **GRANTED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

E N T E R:

Dated: November 18, 2013

_____
MARY M. ROWLAND
United States Magistrate Judge